1  HENNIGAN, BENNETT & DORMAN LLP
   BRUCE BENNETT (SBN 105430)
2  bennettb@hbdlawyers.com
   MONIKA WIENER (SBN 211467)
3  wienerm@hbdlawyers.com
   MICHAEL SCHNEIDEREIT (SBN 234956)
4  schneidereitm@hbdlawyers.com
   865 South Figueroa Street, Suite 2900
5  Los Angeles, California 90017
   Telephone: (213) 694-1200
6  Fax: (213) 694-1234

7  Attorneys for Defendant Rassol, LLC

8            **UNITED STATES BANKRUPTCY COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10                **LOS ANGELES DIVISION**

| | |
|---|---|
| 11  In re | ) Case No. 2:09-bk-42717-BR |
| 12  WALL STREET MART, L.P., | ) Chapter 11 |
| 13       Debtor. | ) |
| 14 | ) |
| 15 | ) Adversary No. 2:10-ap 001950-BR |
| 16  WALL STREET MART, L.P., | ) |
| 17       Plaintiff, | ) **MEMORANDUM OF POINTS AND** |
| 18  vs. | ) **AUTHORITIES IN SUPPORT OF RASSOL,** <br> ) **LLC'S MOTION FOR SUMMARY** <br> ) **JUDGMENT ON ADVERSARY** |
| 19  RASSOL, LLC, | ) **COMPLAINT** |
| 20       Defendant. | ) |
| 21 | ) |
| 22 | ) |
| 23 | ) <u>Hearing:</u> <br> ) Date:    [TBD] |
| 24 | ) Time:    [TBD] <br> ) Place:   Courtroom 1668 |
| 25 | )          255 East Temple St. <br> )          Los Angeles, CA  90012 |
| 26 | ) |

27

28

(left margin, vertical text) HENNIGAN, BENNETT & DORMAN LLP  LAWYERS  LOS ANGELES, CALIFORNIA

# TABLE OF CONTENTS

**Page**

I.     BACKGROUND .......................................................................................... 1

     A.     Wall Street Holds Valuable Assets That Are Not Part Of The
Namco/Namvar Estates ................................................................... 1

     B.     Wall Street Pledged Assets To Secure A Loan From Rassol To
Namco ............................................................................................. 3

     C.     Shortly After The Pledge Was Made, Namco Became Indebted To
Labcog For Over $23 Million, And The Value of Namco's Portfolio
Plunged. .......................................................................................... 3

     D.     Facing Foreclosure By Rassol, Wall Street Filed Bankruptcy Nearly
One Year After Namco And Namvar. .............................................. 4

     E.     The Namco Claim Is Overstated By At Least $5.49 Million. ........... 4

II.    ARGUMENT .............................................................................................. 6

     A.     Standard on Summary Judgment ...................................................... 7

     B.     Rassol Is Entitled To Summary Judgment On Plaintiff's Constructive
Fraudulent Transfer Claims (Second, Third, And Fifth Claims For
Relief). ............................................................................................ 8

          1.     Wall Street Easily Passes The Balance Sheet Solvency Test
Both Prior To And Immediately Following The Pledge. ........... 9

               a)     Step 1:  Equity Value Of Pledged LLCs ...................... 10

               b)     Step 2:  Equity Value Of Labcog ................................. 13

               c)     Step 3: Wall Street Solvency Analysis ......................... 15

          2.     Wall Street Was Not Undercapitalized. ................................. 18

          3.     Wall Street Was Able To Pay Its Debts As They Matured ...... 19

     C.     Because The Pledge Did Not Hinder, Delay, Or Defraud Actual
Creditors Of Wall Street, Rassol Is Also Entitled To Summary
Judgment On Plaintiff's Intentional Fraudulent Transfer Claims
(First and Fourth Claims For Relief) ............................................. 20

     D.     The Allegation That Namvar Was Not Authorized To Sign The
Pledge Agreement Is False And Immaterial. ................................. 23

III.   CONCLUSION ........................................................................................ 24

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Memorandum Of Points And Authorities In Support Of
Rassol LLC's Summary Judgment On Adversary Complaint

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Acequia, Inc. v. Clinton (In re Acequia, Inc.)*
  34 F.3d 800 (9th Cir. Idaho 1994)...................................................................................22

*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242, (1986) .....................................................................................................7

*Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*
  526 U.S. 434 (1998) .................................................................................................11, 14

*Barrett v. Continental Ill. Nat'l Bank & Trust Co.*
  882 F.2d 1 (1st Cir. 1989) ............................................................................................19

*BFP v. Resolution Trust Corp.*
  511 U.S. 531 (1994) .....................................................................................................11

*C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*
  213 F.3d 474 (9th Cir. 2000).........................................................................................23

*Celotex Corp. v. Catrett*
  477 U.S. 317 (1986) .......................................................................................................7

*Central La. Elec. Co. v. Dolet Hills Mining Venture*
  116 F. Supp. 2d 726 (W.D. La. 2000) ...........................................................................10

*Covey v. Commercial Nat'l Bank of Peoria*
  960 F.2d 657 (7th Cir. 1992) .........................................................................................11

*Fox v. Ponce Nicasio Broad., Inc. (In re Ponce Nicasio Broad., LP)*
  Case No. 04-26256-B-7, Adv. No. 06-02228-B, D.C. No. SOC-1,
  2008 Bankr. LEXIS 338 at *28 (Bankr. E.D. Cal. Feb. 7, 2008).........................*passim*

*Hirsch v. Steinberg (In re Colonial Realty Co.)*
  226 B.R. 513 (Bankr. D. Conn. 1998)............................................................................11

*In re Excello Press*
  890 F.2d 896 (7th Cir. 1989) .........................................................................................11

*In re Sterling Dev., Inc.*
  Case No. 11-08-14208 MA, 2009 Bankr. Lexis 172 (Bankr. D.N.M. Jan 26, 2009)..................11

*In re Steve Cavanaugh Ltd. P'ship.*
  Case No. 08-61002-11, 2009 Bankr. LEXIS 1624 (Bankr. D. Mont. June 1, 2009) .................11

*In re Xonics Photochemical*
  841 F.2d 198 (7th Cir. 1998) .........................................................................................14

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

# TABLE OF AUTHORITIES (CONT.)

**Page**

*Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*
  373 B.R. 283 (Bankr. S.D.N.Y. 2007) ..................................................................19

*Kaiser Cement Corp. v. Fischbach & Moore, Inc.*
  793 F.2d 1100 (9th Cir. 1986) ...........................................................................7

*Maxtor Corp. v. Read-Rite (Thailand) Co.*
  Case No. C09202964 SC, 2003 U.S. Dist. LEXIS 27208 at *19 (N.D. Cal. Dec. 4, 2003) .......23

*Maxwell v. KPMG, LLP*
  520 F.3d 713 (7th Cir. Ill. 2008) ......................................................................10

*Meecorp Capital Mkts., LLC v. Oliver*
  Case No. 09-2067, 2010 U.S. Dist. LEXIS 4595 at *12 (D. Minn. Jan. 21, 2010)..................23

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*
  910 F. Supp. 913 (S.D.N.Y. 1995) ..................................................................19

*Nickless v. Lodi (In re Lodi)*
  375 B.R. 33 (Bankr. D. Mass. 2007) ..............................................................20

*Official Committee of Unsecured Creditors of Tousa, Inc. v. Citicorp N. Am., Inc.*
  *(In re Tousa, Inc.)*
  422 B.R. 783 (Bankr. S.D. Fla. 2009) ............................................................11

*Republic Credit Corp. I v. Boyer (In re Boyer)*
  367 B.R. 34 (Bankr. D. Conn. 2007)..........................................................11, 12

*T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assoc.*
  809 F.2d 626 (9th Cir. 1987) .........................................................................7

*VFB LLC v. Campbell Soup Co.*
  482 F.3d 624 (3d Cir. 2007) .........................................................................11

**Statutes and Rules**

11 U.S.C. § 548(a)(1)(B) ..................................................................6, 8, 19, 21

11 U.S.C. § 548(a)(1)(B)(ii)(II) .........................................................................18

11 U.S.C. §101(32)(B) .......................................................................................9

11 U.S.C. § 548(a)(1)(A) ..............................................................................6, 20

Cal. Civ. Code § 3439.05 ..............................................................................6, 8

Cal. Civ. Code §3439.02(b)..............................................................................9

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1

**TABLE OF AUTHORITIES (CONT.)**

2                                                                    **Page**

3   California Civil Code § 3439.04 ................................................................*passim*

4   Fᴇᴅ. R. Cɪᴠ. P. 56(c) ........................................................................7

5   Fᴇᴅ. R. Cɪᴠ. P. 56(e) ........................................................................7

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memorandum Of Points And Authorities In Support Of
Rassol LLC's Summary Judgment On Adversary Complaint

1    This Motion, brought by defendant Rassol LLC ("Rassol"), seeks summary judgment in

2  Rassol's favor of all claims alleged in the Adversary Complaint filed by Wall Street Mart, L.P.

3  ("Wall Street" or "Plaintiff").  At the heart of the Motion is a simple question: was Wall Street

4  rendered insolvent when it pledged certain assets as security for a loan held by Rassol?  The answer

5  to this question can be found in the books and records of Wall Street and its five subsidiaries, which

6  the Plaintiff apparently neglected to consult before filing this action against Rassol.  These

7  documents clearly show that even when the benefit of every doubt is given to the Plaintiff, Wall

8  Street's assets exceeded its liabilities both immediately prior to and immediately after the pledge of

9  assets to Rassol by a margin of over three million dollars at the very least, and more likely by a

10  much greater margin.

11  **I.    BACKGROUND**

12    This adversary proceeding centers around the debtor in the above-captioned chapter 11 case,

13  Wall Street.  Although Wall Street is affiliated with debtors Namco Capital Group, Inc. ("Namco")

14  and Ezri Namvar ("Namvar"), whose chapter 11 cases are also pending before this Court, Wall

15  Street's chapter 11 case was not filed until nearly one year after the involuntary bankruptcy filings

16  against Namvar and Namco, and is separately administered.  [UMF 1-3].  The creditors of the

17  Namco and Namvar estates have no direct claims against Wall Street, but Namco asserts an

18  unsecured intercompany claim of approximately $12.6 million against Wall Street.  [UMF 4].

19  Rassol asserts a secured claim of $18.5 million against Wall Street based upon Wall Street's pledge

20  of certain assets to secure a loan from Rassol to Namco.  By this action, Wall Street seeks to avoid

21  Rassol's security interest, clearing the way for Namco to recover on its alleged claim.  What follows

22  is a description of the basis for each of these claims, and a description of the other assets and

23  liabilities of Wall Street and its subsidiaries.

24    **A.    Wall Street Holds Valuable Assets That Are Not Part Of The Namco/Namvar
25  Estates**

26    Wall Street functions as a holding company for a handful of valuable commercial real estate

27  investments made by Solomon Rastegar ("Rastegar") and Namvar over the course of many years.

28  [UMF 5].  Historically, Rastegar was the principal of Wall Street's former general partner, Sora, Inc.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-1-

("Sora"), and he and/or members of his family (collectively with the Rastegar Family Trust, the "Rastegar Family") held an aggregate 49% ownership interest in Wall Street. [UMF 6-7]. In 2005, however, the Rastegar Family sold its interests to Namvar and/or his affilitates, and ceased to have any ownership interest in Wall Street. [UMF 8]. Following the assignment of the Rastegar Family interests in Wall Street, the limited partners of Wall Street were Namvar affiliates Beshmada, LLC ("Beshmada") and the Namvar Family Trust ("Namvar Trust"), each of which owned 49% interests. [UMF 9]. Sora continued to hold a 1% interest as general partner of Wall Street, but as of June 18, 2007, Namvar had replaced Rastegar as Chief Executive Officer of Sora. [UMF 10-11]. As of November 12, 2009, Namco replaced Sora as Wall Street's general partner. [UMF 12].

At all times relevant to this Motion, Wall Street's holdings have consisted of 100% membership interests in five (5) limited liability companies (collectively, the "LLCs"): Buckingham Heights Lease, LLC ("Buckingham Heights"), Culver Marina Lease, LLC ("Culver Marina"), McConnell Marina Lease, LLC ("McConnell Marina"), Watt Leed Lease, LLC ("Watt Leed"), and Labcog, LLC ("Labcog"). [UMF 13]. As more fully explained below, in 2008, Wall Street pledged 80% of its membership interests in four of the LLCs – Buckingham Heights, Culver Marina, McConnell Marina, and Watt Leed (collectively, the "Pledged LLCs") – to Rassol (the "Pledge"). [UMF 14]. Each of the Pledged LLCs owns commercial real estate that is subject to a long-term ground lease that produces a regular rental income stream (collectively, the "Ground Leases"). [UMF 15]. While the aggregate value of the property held by the Pledged LLCs is unknown, Wall Street estimates the current value at $24 million, and has alleged that the Ground Leases had a value of $16-19 million as of the date of the Pledge to Rassol. [UMF 16-17]. These properties are, however, also encumbered by a loan of approximately $12.5 million that was taken out by the Pledged LLCs in December of 2005 with Countrywide Commercial Real Estate Finance, Inc (the "Countrywide Loan"). [UMF 18-19].

In contrast to the Pledged LLCs, Labcog no longer holds any real property interests, but as of the Pledge Date it owned a property located at 101, 111, 123, 125, 127, 143, 145, 159, 165, 171, and 175 South La Brea Avenue in Los Angeles (the "S. La Brea Property") that was subsequently sold for $30 million. [UMF 20-22]. As further explained below, Labcog used the proceeds of the sale to

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-2-

pay off an intercompany liability of $5.95 million to Namco, and loaned the remaining proceeds to

Namco, thereby allowing Namco to pay off a $10 million loan from Hanmi Bank to Namco (the

"Hanmi Loan") that was secured by a pledge of Labcog's interest in the S. La Brea Property.  [UMF

20-23].  As a result, Labcog presently holds over $23 million in intercompany claims against

Namco, and a nominal amount of cash.  [UMF 23-24].

### B.    Wall Street Pledged Assets To Secure A Loan From Rassol To Namco

Over a period of many years predating the Namco and Namvar bankruptcies, the Rastegar

Family made a series of unsecured loans to Namco.  [UMF 25].  By August of 2008, the total

balance owing on various Rastegar Family loans amounted to $18,525,000.  [UMF 26].  At that

time, the outstanding loans were assigned to a newly formed entity, Rassol.  [UMF 26].  On August

22, 2008 (the "Pledge Date"), Rassol entered into a new loan and security agreement with Namco

(the "Rassol Loan") in the amount of $18,525,000 with a maturity date of June 1, 2009, secured by

the Pledge.  [UMF 27].  The preexisting unsecured loans to Namco by the Rastegar Family were

extinguished.  [UMF 28].

### C.    Shortly After The Pledge Was Made, Namco Became Indebted To Labcog For Over $23 Million, And The Value of Namco's Portfolio Plunged.

Approximately one week after the Pledge Date, on August 28, 2008, the S. La Brea Property

owned by Labcog was sold for $30 million.  [UMF 22].  According to the books and records of

Namco, there were no outstanding obligations against the S. La Brea Property with the exception of

approximately $2.8 million in intercompany loans due to Namco, plus accrued interest of

approximately $3.15 million, for a total of $5.95 million. After repayment of this amount to Namco,

the remainder of the proceeds from the sale of the S. La Brea Property was used to satisfy various

obligations of Namco, including the Hanmi Loan, resulting in an intercompany loan balance of over

$23 million owed by Namco to Labcog.  [UMF 23].  Labcog's $17.7 million obligation to Wall

Street was not repaid.  [UMF 30].

Shortly thereafter, the U.S. economy experienced its worst plunge in the better part of a

century.  In the four months following the Pledge Date and the sale of the S. La Brea Property

(September-December of 2008), the S&P 500 lost one third of its value.  [UMF 31].  Not

1    surprisingly, Namvar's woes escalated rapidly during this time frame, leading to the filing of

2    involuntary bankruptcy petitions against Namvar and Namco on December 23, 2008.  [UMF 2-3].

3        In its bankruptcy schedules, Namco listed unsecured intercompany liabilities to the Pledged

4    LLCs in an aggregate amount of over $7.6 million, and an unsecured intercompany liability to

5    Labcog of over $23 million.  [UMF 32-33].  In addition, Namco scheduled an intercompany

6    receivable of approximately $12.6 million from Wall Street.  [UMF 34].

7        **D.    Facing Foreclosure By Rassol, Wall Street Filed Bankruptcy Nearly One Year
8            After Namco And Namvar.**

9        With Namco and Namvar in bankruptcy, the obligations of Wall Street (then a non-debtor)

10    under the Pledge were triggered.  [UMF 35].  Accordingly, Rassol made demand on June 11, 2009

11    that Wall Street surrender the membership interests subject to the Pledge.  [UMF 36].  When the

12    demand went unsatisfied, Rassol noticed a public UCC foreclosure sale of the pledged membership

13    interests for September 17, 2009.  [UMF 37].  Nevertheless, in an attempt to work out a forbearance

14    plan, Rassol continued negotiations with the chapter 11 trustee for Namco (the "Namco Trustee"), in

15    his capacity as manager of Wall Street's new general partner, Namco.  [UMF 38].  In furtherance of

16    that goal, the foreclosure sale was twice continued, first to October 20, 2009 and then to November

17    23, 2009.  [UMF 39].

18        On the eve of the foreclosure sale by Rassol, November 20, 2009, Wall Street filed a

19    voluntary petition under chapter 11 of the Bankruptcy Code.  [UMF 1].  In its schedules, Wall Street

20    listed total assets of approximately $24.9 million and total claims of approximately $12.7 million,

21    not including the $18.5 million secured claim of Rassol. [UMF 40].  Namco subsequently filed a

22    proof of claim in Wall Street's chapter 11 case in approximately the same amount (the "Namco

23    Claim").  [UMF 4].

24        **E.    The Namco Claim Is Overstated By At Least $5.49 Million.**

25        Although no supporting documentation was filed with the Namco Claim, an attachment to

26    the proof of claim form references certain documents that were previously provided to Rassol on or

27    about March 10, 2010, in response to informal document requests made to both Wall Street and the

28    Namco Trustee.  [UMF 43].  These documents reveal that the basis for the Namco Claim is the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-4-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1  intercompany balance purportedly owing from Wall Street to Namco as of the Wall Street petition

2  date, as reflected in Namco's general ledger and in Namco's bankruptcy schedules.  [UMF 41].

3      As more fully discussed below, the Namco Claim is flawed in at least two respects.  First,

4  the Namco Claim is only one piece in a larger puzzle that comes together only when all of the

5  various intercompany balances as between Namco, Wall Street, and the five LLCs are taken into

6  account.  In fact, as noted above, Namco itself scheduled undisputed intercompany liabilities of over

7  $7.6 million to the Pledged LLCs, and over $23 million to Labcog which are not addressed

8  anywhere in Wall Street's schedules or in the Adversary Complaint in this action.  Each of these

9  liabilities reflects *cash advances* previously made to Namco by the LLCs – in the case of the

10  Pledged LLCs, from the proceeds of the Countrywide Loan, and in the case of Labcog, from the S.

11  La Brea Property sale proceeds – that were never repaid.  [UMF 23; 32-33; 42].

12      Second, Namco's general ledger – and consequently the Namco Claim – fails to account for

13  certain additional payments made by Wall Street to Namco in 2005 from the proceeds of the

14  Countrywide Loan.  After making an aggregate amount of over $7 million in direct loans to Namco

15  as noted above, the Pledged LLCs were left with over $5 million in remaining proceeds from the

16  Countrywide Loan.  [UMF 43].  As illustrated in <u>Exhibit 1</u>, this remainder was ultimately distributed

17  to Namco in four steps, as follows.

18      *Step 1*: Buckingham Heights made a $4.157 million intercompany loan to Wall Street (the

19  "<u>First Interco Loan</u>").  [UMF 44].

20      *Step 2*: $1.559 million of the proceeds of the First Interco Loan were redistributed from Wall

21  Street as intercompany loans to Culver Marina ($367,000), Watt Leed ($861,000), and McConnell

22  Marina ($331,000) (collectively, the "<u>Second Interco Loans</u>").[UMF 45].

23      *Step 3*: The proceeds of the Second Interco Loans, combined with the direct proceeds from

24  the Countrywide Loan that were still held by Culver Marina, Watt Leed and McConnell Marina (*i.e.*,

25  proceeds that had not been loaned to Namco), were upstreamed in a third set of intercompany loans

26  from Culver Marina ($802,000), Watt Leed ($1,364,000) and McConnell Marina ($768,000) to Wall

27  Street (collectively, the "<u>Third Interco Loan</u>").  [UMF 46].

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    *Step 4*: Wall Street distributed the proceeds of the Interco Loans in the aggregate amount of

2    approximately $5.49 million to Namco.  [UMF 47].  However, for reasons that are not clear, the

3    Step 4 payment was never recorded in Namco's books.  [UMF 48].  Accordingly, the Namco Claim

4    – which is simply based on the net intercompany balance owed to Namco by Wall Street as shown

5    in the Namco general ledger –is overstated by $5.49 million.  When the Namco Claim is reduced to

6    reflect this payment, the resulting intercompany claim amount is no more than $7.1 million.[1]

7    ## II.    ARGUMENT

8        Wall Street's claims in this action boil down to two theories of recovery: constructive

9    fraudulent transfer and intentionally fraudulent transfer.[2]  Each of these theories fails when the gaps

10   left by the allegations in the Adversary Complaint are filled in with undisputed facts that can be

11   gleaned from a basic review of the books and records of Wall Street and the five LLCs.  The sum

12   total of Plaintiff's allegations with respect to Wall Street's solvency as of the Pledge Date are that

13   Wall Street owed Namco $12.6 million, and that the equity in the Pledged LLCs was worth

14   somewhere between $4-7 million once the liability on the Countrywide Loan is factored in.  What

15   the Complaint does not reveal, however, is that, <u>as of the Pledge Date</u>:

16       (i)       the Pledged LLCs were owed over $7 million by Namco;

17       (ii)      Wall Street was Labcog's largest creditor, with an intercompany claim of over $17

18   million; and

19       (iii)     Labcog owned property worth $30 million.

20       As further explained below, even assuming that the Namco Claim is fully valid (which it is

21   not), the above facts – each of which is based upon the financial records of Wall Street and the LLCs

22

23   [1] Nothing in this Motion should be construed as an admission or concession with respect to the
24   validity of any part of the Namco Claim.  Rassol reserves any and all rights to contest the validity of
     the Namco Claim.

25   [2] Broken down by claim, the Second, Third and Fifth claims for relief allege that the Pledge should
26   be avoided as a constructively fraudulent transfer under section 3439.04 of the California Uniform
     Fraudulent Transfer Act (the "UFTA") and section 548(a)(1)(B)of the Bankruptcy Code, while the
27   First and Fourth claims for relief allege that the Pledge should be avoided as an intentionally
     fraudulent transfer pursuant to Sections 3439.05 of the UFTA and section 548(a)(1)(A)of the
28   Bankruptcy Code.  The Sixth claim seeks attorneys fees and costs.

– demonstrate that Wall Street was solvent both before and after making the Pledge to Rassol, and that no creditor of Wall Street was harmed by the Pledge.

### A.    Standard on Summary Judgment

Summary judgment should be granted pursuant Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Bankruptcy Rule 7056, when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[3]  Summary judgment is intended to "isolate and dispose of factually unsupported claims" in order to "secure the just, speedy and inexpensive determination of every action."[4]

"The initial burden of showing the absence of material factual issues rests on the proponent of a summary judgment motion.  Once that burden is met, however, the opponent must counter with specific factual allegations revealing a genuine dispute of fact in order to preclude summary judgment."[5]  "If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment."[6] The nonmoving party "'must set forth specific facts showing that there is a genuine issue for trial.'"[7]  This requires the court to determine "whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented.  The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."[8]

_____

[3] Fed. R. Civ. P. 56(c).

[4] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 327 (1986) (citation omitted).

[5] *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[6] *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987) (internal citations omitted).

[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Rule 56(e).

[8] *Id*. at 252.

Memorandum Of Points And Authorities In Support Of
Rassol LLC's Summary Judgment On Adversary Complaint

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

**B.**     **Rassol Is Entitled To Summary Judgment On Plaintiff's Constructive Fraudulent Transfer Claims (Second, Third, And Fifth Claims For Relief).**

Under both the Bankruptcy Code and the UFTA, transfers are avoidable as constructively fraudulent only to the extent that the plaintiff can establish ***both*** (a) that the debtor received less than equivalent value in exchange for the transfer; ***and*** (b) that the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer.[9]  The failure to establish either element is grounds for summary judgment.[10]  Here, even if it is assumed for the purposes of this Motion that Wall Street did not receive equivalent value in exchange for the Pledge, the evidence shows that Wall Street was solvent both before and after the Pledge was made.[11]

_____

[9] Section 3439.05 of the California Civil Code states:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation ***and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation***.

Cal. Civ. Code § 3439.05 (emphasis added).  Section 548(a)(1)(B) of the Bankruptcy Code similarly provides, in relevant part, that a transfer is avoidable as fraudulent if the debtor:

> (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; ***and***

> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation

11 U.S.C. § 548(a)(1)(B) (emphasis added).

[10] *See, e.g., Fox v. Ponce Nicasio Broad., Inc. (In re Ponce Nicasio Broad., LP*), Case No. 04-26256-B-7, Adv. No. 06-02228-B, D.C. No. SOC-1, 2008 Bankr. LEXIS 338 at *28 (Bankr. E.D. Cal. Feb. 7, 2008).  In *In re Ponce Nicasio*, the court granted summary judgment on a fraudulent transfer action even though the defendants had not established that the transfer was made for reasonably equivalent value because the plaintiff "fail[ed] to present substantial evidence that [the debtors] were insolvent at the time of the transfers . . . or that they became insolvent as a result of the transfers." *Id.*

[11] Rassol does not concede that Wall Street did not receive equivalent value for the exchange. However, it does not contend that there is no genuine issue of material fact with respect to this element.  In any event, the law is clear that summary judgment may be granted so long as there is no genuine issue of material fact as to Wall Street's solvency.

1    With respect to insolvency, both the Bankruptcy Code and the UFTA provide three possible

2   tests.  These tests can be broadly characterized as follows:

3    (i)    Balance sheet insolvency;

4    (ii)    Inability to pay debts as they mature; or

5    (iii)    Undercapitalization.

6    As discussed below, Wall Street was comfortably solvent as of the Pledge Date based on

7   each of these tests.

8    **1.    Wall Street Easily Passes The Balance Sheet Solvency Test Both Prior To
9        And Immediately Following The Pledge.**

10    Under the UFTA, balance sheet insolvency with respect to partnerships is established if "at

11   fair valuations, the sum of the partnership's debts is greater than the aggregate of all of the

12   partnership's assets and the sum of the excess of the value of each general partner's nonpartnership

13   assets over the partner's nonpartnership debts."[12]  Similarly, under section 101(32)(B) of the

14   Bankruptcy Code, a partnership is insolvent if the sum of such partnership's debts is greater than the

15   aggregate of, at a fair valuation:

16    (i) all of such partnership's property, exclusive of property of the kind
     specified in subparagraph (A)(i) of this paragraph; and

17
     (ii) the sum of the excess of the value of each general partner's
18    nonpartnership property, exclusive of property of the kind specified in
     subparagraph (A) of this paragraph, over such partner's nonpartnership
19    debts.[13]

20    Here there is no genuine issue as to the fact that, both immediately prior to and following the

21   Pledge, Wall Street's assets exceeded its liabilities.  It is worth noting at the outset that Wall Street's

22

23   [12] Cal. Civ. Code §3439.02(b).

24   [13] 11 U.S.C. §101(32)(B).  Although the result of the second prong of the calculation under both
25   statutes (*i.e.*, the sum of the excess of the value of non-partnership assets over non-partnership debts)
     is not currently known to Rassol, it is does not make a difference to the outcome on this Motion so
26   long as the first prong alone demonstrates that Wall Street was solvent at the relevant times.  This is
     because the value resulting from the second prong of the calculation is necessarily positive and thus
     would only increase the value of the partnership's assets.  Consequently, if Wall Street was solvent
27   because the sum of its debts was not greater than the *aggregate* of its property, any amount resulting
     from the calculation under the second prong would only make it more solvent.
28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Memorandum Of Points And Authorities In Support Of
Rassol LLC's Summary Judgment On Adversary Complaint

own balance sheet indicates that it had $25 million in equity as of December 31, 2008

(approximately five months after the Pledge was made). [UMF 49]. As will be seen below, this in

fact appears to be a fairly accurate assessment. Nevertheless, the following analysis proceeds in

three steps to break down Wall Street's assets and liabilities as of the Pledge Date to show that under

no conceivable set of facts could Wall Street have been insolvent immediately after the Pledge. In

**Step 1** of the analysis, the value of Wall Street's equity interest in the four Pledged LLCs is

calculated; in **Step 2**, the value of Wall Street's equity interest in Labcog is calculated; and in **Step

3**, the values obtained in Steps 1 and 2 are carried forward into an overall "balance sheet" solvency

analysis for Wall Street.

### a)   Step 1:  Equity Value Of Pledged LLCs

The measure of Wall Street's solvency as of the Pledge Date is substantially dependent on

the value of its 100% equity interests in the Pledged LLCs and Labcog. This value is determined by

subtracting total liabilities from total assets for the Pledged LLCs and for Labcog.[14]

The Pledged LLCs' assets on the Pledge Date consisted of (i) the ground leases; and (ii) an

intercompany loan receivable from Namco. [UMF 15, 32, 42]. The Pledged LLCs' liabilities

consisted of the payable on the Countrywide Loan. [UMF 18-19]. As explained in the analysis that

follows, Wall Street's equity in the Pledged LLCs can be broken down as shown in Table 1, below.

**Table 1: Equity Value of Pledged LLCs** *(as of 8/22/08; dollars in millions)*

|  | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 4 |
|---|---|---|---|---|
| **Namco Percentage Payable on Liabilities** | **0%** | **25%** | **50%** | **100%** |
| **Pledged LLCs Assets** | | | | |
| Minimum Property Value (Ground Leases)[(1)] | $16.00 | $16.00 | $16.00 | $16.00 |
| Recovery on Namco Intercompany Receivable [(2)] | $0.00 | $1.91 | $3.83 | $7.66 |
| Total Pledged LLC Assets | $16.00 | $17.91 | $19.83 | $23.66 |
| **Pledged LLCs Liabilities** | | | | |
| Countrywide Loan[(3)] | $12.18 | $12.18 | $12.18 | $12.18 |
| Total Pledged LLC Liabilities | $12.18 | $12.18 | $12.18 | $12.18 |
| **Total Pledged LLCs Equity** | **$3.82** | **$5.74** | **$7.65** | **$11.48** |

---

[14] *See, e.g. Maxwell v. KPMG, LLP*, 520 F.3d 713, 718 (7th Cir. Ill. 2008) (calculating equity as
assets minus debt); *Central La. Elec. Co. v. Dolet Hills Mining Venture*, 116 F. Supp. 2d 726, 741
(W.D. La. 2000) ("[T]he meaning of equity is assets minus liabilities").

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Memorandum Of Points And Authorities In Support Of
Rassol LLC's Summary Judgment On Adversary Complaint

**NOTES ON TABLE 1**:

*(1) Ground Leases*.  The Complaint alleges that on the date of the Pledge, "the collective value of the Ground Leases was approximately $16-19 million." [UMF 17].  This is a conservative estimate.  The true value was at the upper end of, or exceeded, this range, as evidenced by the fact that an offer was made to purchase the Ground Leases for $18.5 million on December 17, 2008. [UMF 50].  The sale price of an asset is *prima facie* evidence of its value.[15]  Given the severe market downturn between August and December of 2008 [UMF 31], of which the Court may take judicial notice,[16] the Ground Leases must have been worth more than $18,500,000 on the date of the Pledge. Nevertheless, in order to give the Plaintiff the benefit of every doubt, this Motion assumes that the value of the Ground Leases on the date of the Pledge was Plaintiff's most conservative valuation of **$16 million**.

*(2) Intercompany Loan Receivable from Namco*.  The Pledged LLCs' other asset on the date of the Pledge was the $7.655 million cumulative intercompany loan receivable from Namco which, as noted above, is listed in Namco's schedules.  [UMF 32, 42].  This receivable arose from cash

[15] *See, Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1998) (holding that "the best way to determine value is exposure to the market;" *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537-38 (1994) ("The market value of . . . a piece of property is the price which it might be expected to bring if offered for sale in a fair market." (quotations omitted); *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) ("Absent some reason to distrust it, the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.") (quotation omitted); *In re Excello Press*, 890 F.2d 896, 904-05 (7th Cir. 1989) ("The price obtained in a commercially reasonable sale is not evidence of the market value, which can be discounted or thrown out. It is the market value.") (emphasis in original); *see also Official Committee of Unsecured Creditors of Tousa, Inc. v. Citicorp N. Am., Inc.* (*In re Tousa, Inc.*), 422 B.R. 783, 860 (Bankr. S.D. Fla. 2009) ("To decide whether a firm is insolvent within the meaning of § 548(a)(2)(B)(I), a court should ask: What would a buyer be willing to pay for the debtor's entire package of assets and liabilities.  If the price is positive, the firm is solvent; if negative, insolvent." (quoting *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 660 (7th Cir. 1992)).

[16] *See Republic Credit Corp. I v. Boyer (In re Boyer)*, 367 B.R. 34, 41 fn. 21 (Bankr. D. Conn. 2007) (Taking judicial notice "that the real estate market experienced a steep downturn in the late 1989/1990 time frame.") (citing *Hirsch v. Steinberg* (*In re Colonial Realty Co.*), 226 B.R. 513, 516 (Bankr. D. Conn. 1998)); *see also In re Steve Cavanaugh Ltd. P'ship.*, Case No. 08-61002-11, 2009 Bankr. LEXIS 1624 (Bankr. D. Mont. June 1, 2009) (noting that "the entire real estate market is suffering from a prolonged decline"); *In re Sterling Dev., Inc.,* Case No. 11-08-14208 MA, 2009 Bankr. Lexis 172 (Bankr. D.N.M. Jan 26, 2009) (finding a decline in the value of a parcel of commercial real estate owned by the debtor based upon "the current economic market conditions for sales of commercial real estate," despite a lack of testimony regarding the rate of depreciation).

Memorandum Of Points And Authorities In Support Of
Rassol LLC's Summary Judgment On Adversary Complaint

1  loans made by each of the Pledged LLCs directly to Namco out of the proceeds of the Countrywide

2  Loan. [UMF 42]. Whether the full $7.655 million can be considered an asset of the Pledged LLCs

3  depends on whether Namco could have paid the loan in full on the date of the Pledge. While it is

4  difficult to say with certainty what the value of Namco was on the Pledge Date, once again it is

5  apparent that whatever value it had at that point in time decreased significantly during the four

6  months between the Pledge Date and the Namco bankruptcy filing. As noted above, the Court may

7  take judicial notice that worldwide financial and real estate markets suffered colossal declines

8  during this period.[17] [UMF 31]. In any event, Namco's schedules reflect assets of $671 million as of

9  the Namco petition date and liabilities of only $545 million. [UMF 51]. While the assets consist

10  almost entirely of intercompany receivables from various affiliates of uncertain value, it should be

11  clear from the numerous proceedings before this Court relating to the valuation and disposition of

12  various valuable assets in which Namco has an interest that there is some residual value in Namco's

13  holdings. Thus, the intercompany receivable was undeniably worth something as of the Pledge

14  Date.

15       In order to give the Plaintiff the full benefit of every doubt, however, Rassol has assumed in

16  Scenario 1 shown in Table 1, above, that Namco would not have been able to pay a single penny on

17  its liabilities on the Pledge Date. Scenario 2 assumes that Namco could pay 25%; Scenario 3

18  assumes a payable of 50%; and Scenario 4 assumes a payable of 100%. As will be seen below, Wall

19  Street emerges comfortably solvent in every one of these scenarios.

20       *(3) Countrywide Loan*. The Pledged LLCs' end of year balance sheets for 2007 show a

21  liability owing on the Countrywide loan of approximately $12.18 million. [UMF 52]. The actual

22  balance owing on the date of the Pledge was in fact less, since payments were made over the course

23  of 2008.[18] Nevertheless, for the purposes of this Motion the liability on the date of the Pledge is

24  assumed to be $12.18 million.

25

26  [17] *See In re Boyer*, 367 B.R. at 41 fn. 16, and other authorities cited at fn.16.

27  [18] In the Pledged LLCs' December 31, 2008 balance sheets, the liability is booked as approximately
$11.99 million. [UMF 53].

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Based on the above, Table 1 demonstrates that, drawing every possible inference in favor of the Plaintiff by assuming that the property was worth only $16 million on the date of the transfer and that Namco could not have paid a penny on any of its intercompany loans, the value of Wall Street's equity interest in the Pledged LLCs was **at least $3.82 million**.  Assuming that Namco could have paid even 50%, the equity value of the Pledged LLCs was over **$7.6 million**.

**b)**      **Step 2:  Equity Value Of Labcog**

Labcog's assets on the date of the Pledge consisted solely of the S. La Brea Property.  [UMF 20].  Labcog's liabilities on the date of the transfer consisted of: (i) the Hanmi Loan, to the extent that Namco, as principal obligor on the loan, could not repay it; and (ii) two intercompany loans, one payable to Namco in the total amount (principal plus interest) of approximately $5.95 million, and one payable to Wall Street in the amount of $17.7 million.  [UMF 21, 29-30].  Table 2, below, presents a detailed breakdown of the analysis that follows.

**Table 2: Labcog Equity Value And Intercompany Loan Payouts** *(as of 8/22/08; dollars in millions)*

|  | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 4 |
|---|---|---|---|---|
| **Namco Percentage Payable on Liabilities** | 0% | 25% | 50% | 100% |
| **Labcog Assets** | | | | |
| Market Value of Property[1] | $30.00 | $30.00 | $30.00 | $30.00 |
| Total Assets | $30.00 | $30.00 | $30.00 | $30.00 |
| **Labcog Liabilities** | | | | |
| *Secured Liabilities* | | | | |
| Pledge to Secure Hanmi Bank Loan to Namco[2] | $10.00 | $7.50 | $5.00 | $0.00 |
| *Total Secured Loans* | $10.00 | $7.50 | $5.00 | $0.00 |
| | | | | |
| Residual Value | $20.00 | $22.50 | $25.00 | $30.00 |
| *Intercompany Liabilities* | | | | |
| Intercompany Loan to Wall Street Mart[3] | $17.70 | $17.70 | $17.70 | $17.70 |
| Intercompany Loan to Namco [3] | $5.95 | $5.95 | $5.95 | $5.95 |
| *Total Intercompany Liabilities* | $23.65 | $23.65 | $23.65 | $23.65 |
| *% Recovery on Intercompany Liabilities* | *85%* | *95%* | *100%* | *100%* |
| *Payout on Intercompany Liabilities* | | | | |
| Intercompany Loan to Wall Street Mart | $14.97 | $16.84 | $17.70 | $17.70 |
| Intercompany Loan to Namco | $5.03 | $5.66 | $5.95 | $5.95 |
| *Total Payout on Intercompany Liabilities* | $20.00 | $22.50 | $23.65 | $23.65 |
| | | | | |
| **Labcog Equity** | $0.00 | $0.00 | $1.35 | $6.35 |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    **NOTES ON TABLE 2**:

2    *(1) Value of the S. La Brea Property*.  Labcog sold the S. La Brea Property for $30 million

3    less than a week after the date of the Pledge.  [UMF 22].  The purchase price of a property is prima

4    facie evidence of the true value of the property.[19]  Labcog therefore had assets of **$30 million** on the

5    date of the Pledge.

6    *(2) Pledge Securing Hanmi Loan*.  As noted above, the S. La Brea Property had been

7    pledged as collateral for the $10 million Hanmi Loan to Namco.  [UMF 21].  This created a

8    contingent liability for Labcog, since Labcog was liable on the Hanmi Loan only to the extent that

9    Namco defaulted.  The value of the liability is therefore determined by the likelihood that Namco, as

10   the primary obligor on the Hanmi Loan, would be unable to pay on its obligation.[20]

11   Again, as discussed with respect to the intercompany Namco liability payable to the Pledged

12   LLCs, the evidence shows that Namco would have been able to pay off some percentage of the

13   Hanmi Loan as of the Pledge Date.  However, to eliminate any doubt, Scenario 1 once again

14   assumes that Namco would not have been able to pay any of its liabilities on the Pledge Date, such

15   that Labcog's liability on the Hanmi Loan would have been **$10 million**.

16   *(3) Intercompany Loans*.  In addition to the Hanmi Loan, Labcog's liabilities on the Pledge

17   Date included two intercompany loans, one payable to Namco and one to Wall Street.  [UMF 21;

18   29-30, 30-32].  The loan balance payable to Namco was approximately $5.95 million, including

19   principal and interest.  [UMF 29].  The loan balance payable to Wall Street was in the amount of

20   $17.7 million.  [UMF 29-30].  The total liability on the intercompany loans was therefore **$23.65**

21   **million**.

22   Based on the above, using the most conservative estimates possible as set forth in Scenario 1,

23   Labcog's liabilities on the date of the Pledge are calculated as $10 million + $23.65 million, for a

24   ───────────────

25   [19] *See, e.g.*, *203 N. LaSalle St. P'ship*, 526 U.S. at 457 and other authorities cited at fn. 15.

26   [20] For solvency purposes, a liability must be valued based on the likelihood of the contingency
     coming to pass – it cannot be valued at the full amount of the obligor liability.  *In re Xonics*

27   *Photochemical*, 841 F.2d 198, 200 (7th Cir. 1998).  To value a contingent liability, it is necessary to
     discount it by the probability, on the relevant date, that the contingency would occur and the liability

28   become real.  *Id.*

total of $33.65 million.  Labcog's total assets equaled $30 million.  Thus, after subtracting liabilities

from assets, under Scenario 1, Labcog had negative equity of **$(3.65)** million on the date of the

Pledge.  If, however, Namco could have paid even 50% of its obligation on the Hanmi Loan as of

the Pledge Date, then Labcog would have been solvent, with an equity value of **over $1.3 million**.

### c)    Step 3: Wall Street Solvency Analysis

On the Pledge Date, Wall Street's assets consisted of (i) 100% of the membership interests in

the Pledged LLCs; (ii) 100% of the membership interests in Labcog; and (iii) a $17.7 million

intercompany receivable from Labcog.  [UMF 13; 29-30].  Its liabilities immediately following the

Pledge consisted of (y) the intercompany payable on the Namco Claim [UMF 4]; and (z) the liability

resulting from the Pledge itself.  As explained above, the Namco Claim must be reduced from $12.6

million to $7.11 million in order to account for the $5.49 million payment made by Wall Street to

Namco from proceeds of the Countrywide Loan that were upstreamed to Wall Street by the Pledged

LLCs in 2005, which was erroneously omitted from Namco's books.

Utilizing the values calculated above for the equity values of the Pledged LLCs and Labcog,

and using $7.11 million as the maximum allowable amount of the Namco Claim, Table 3, below,

shows that Wall Street's assets comfortably exceeded its liabilities both before and after the Pledge.

## Table 3: Wall Street Mart Solvency Analysis Assuming $7.11mm Liability On Namco Claim

*(as of 8/22/08; dollars in millions)*

|  | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 4 |
|---|---|---|---|---|
| **Namco Percentage Payable on Liabilities** | 0% | 25% | 50% | 100% |
| **Wall Street Mart Assets** | | | | |
|    Equity Interest in Pledged LLCs [1] | $3.82 | $5.74 | $7.65 | $11.48 |
|    Recovery on Labcog Interco Loan [2] | $14.97 | $16.84 | $17.70 | $17.70 |
|    Labcog Equity [1] | $0.00 | $0.00 | $1.35 | $6.35 |
| Total Wall Street Mart Assets | $18.79 | $22.58 | $26.70 | $35.53 |
| **Wall Street Mart Liabilities** | | | | |
|    Interco Loan to Namco (Namco Claim) [3] | $7.11 | $7.11 | $7.11 | $7.11 |
|    Pledge of 80% Interest in Pledged LLCs [4] | $3.06 | $3.44 | $3.06 | $0.00 |
| Total Wall Street Mart Liabilities | $10.17 | $10.55 | $10.17 | $7.11 |
| **Total Wall Street Mart Equity** | **$8.62** | **$12.02** | **$16.53** | **$28.42** |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Moreover, Table 4, below, demonstrates that *even if the Namco Claim is not reduced from $12.6 million to $7.11 million*, Wall Street would still emerge solvent in every scenario.

**Table 4: Wall Street Mart Solvency Analysis Assuming $12.6mm Liabilty On Namco Claim**

*(as of 8/22/08; dollars in millions)*

|  | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 4 |
|---|---|---|---|---|
| **Namco Percentage Payable on Liabilities** | 0% | 25% | 50% | 100% |
| **Wall Street Mart Assets** | | | | |
| Equity Interest in Pledged LLCs [1] | $3.82 | $5.74 | $7.65 | $11.48 |
| Recovery on Labcog Interco Loan [2] | $14.97 | $16.84 | $17.70 | $17.70 |
| Labcog Equity [1] | $0.00 | $0.00 | $1.35 | $6.35 |
| Total Wall Street Mart Assets | $18.79 | $22.58 | $26.70 | $35.53 |
| **Wall Street Mart Liabilities** | | | | |
| Interco Loan to Namco (Namco Claim) [3] | *$12.60* | *$12.60* | *$12.60* | *$12.60* |
| Pledge of 80% Interest in Pledged LLCs [4] | $3.06 | $3.44 | $3.06 | $0.00 |
| Total Wall Street Mart Liabilities | $15.66 | $16.04 | $15.66 | $7.11 |
| **Total Wall Street Mart Equity** | **$3.83** | **$6.53** | **$11.04** | **$22.93** |

**NOTES ON TABLES 3 & 4**:

*(1) Equity in LLCs*. The values shown for Wall Street's equity interests in the Pledged LLCs and Labcog are calculated as set forth in Steps 1 and 2, above.

*(2) Recovery on Labcog Intercompany Loan*. Wall Street's assets on the date of the Pledge also included a $17.7 million receivable from Labcog. [UMF 29-30]. This is the same receivable counted as a liability above with respect to Labcog. Under Scenarios 3 and 4, the full receivable would be recoverable from Labcog, because this assumes that Namco would be able to pay 50% or more of the Hanmi Loan, on which it was the primary obligor. However, under Scenarios 1 and 2, the entire amount of this receivable would not be recoverable, and Wall Street would instead recover its pro rata share of the $20 million residual value in the S. La Brea Property once the Hanmi Loan was paid.

In order to calculate the actual amount payable on the $17.7 million receivable, the available Labcog assets must be pro-rated among the $23.65 million in unsecured Labcog liabilities. Since Labcog had $30 million in assets on the date of the Pledge, and a $10 million secured liability on the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   Hanmi Loan, it was left with $20 million with which to pay the $23.65 in unsecured liabilities – an

2   85% recovery.  An 85% recovery on the unsecured liabilities results in a $14.97 million recovery on

3   the $17.7 million payable to Wall Street and a $5.03 million recovery on the $5.95 million payable

4   to Namco.  Note that this is again subject to the highly conservative "Scenario 1" assumption that

5   Namco was unable to pay anything at all on its liabilities.  If Namco could have paid even 36% on

6   the Hanmi Loan, Labcog would have been fully solvent and the entire $17.7 million payable would

7   be counted as an asset on Wall Street's account.

8   *(3) Namco Claim*.  Wall Street's total liabilities immediately prior to the Pledge consisted

9   solely of the alleged Namco Claim in the amount of approximately $12.6 million.  [UMF 4 ].

10  However, as noted above, and as illustrated in Exhibit 1, the alleged Namco Claim – which appears

11  to be based solely on entries in the Namco general ledger – fails to account for a significant payment

12  by Wall Street to Namco in December of 2005 from the proceeds of the Countrywide Loan, and

13  therefore must be reduced to $7.11 million.

14  *(4) Wall Street's Liability on the Pledge*.  Under the terms of the Pledge, Wall Street

15  pledged to Rassol, as security for the Rassol Loan, all of its interest in 80% of the membership

16  interests of the Pledged LLCs.  However, as with Labcog's liability on the Hanmi Loan, Wall

17  Street's liability on the Pledge is contingent and exists only to the extent that Namco was unable to

18  pay on the Rassol Loan.  Once again, Scenario 1 assumes that Namco could have paid nothing.  On

19  this assumption, Wall Street's liability on the Pledge was the full value of 80% of its membership

20  interests in the Pledged LLCs.  As calculated above, the Pledged LLCs had total equity of $3.82

21  million on the date of the pledge.  Eighty percent of $3.82 million equals $3.06 million.

22  Given all of the above, and as shown in Tables 3 and 4, it is clear that even if every inference

23  is drawn in favor of the Plaintiff (including allowance of the entire $12.6 million Namco Claim),

24  Wall Street was solvent immediately after the Pledge by a margin of ***at least $3.83 million***, and

25  more likely by a much greater margin.

26

27

28

Memorandum Of Points And Authorities In Support Of
Rassol LLC's Summary Judgment On Adversary Complaint

2.    <u>**Wall Street Was Not Undercapitalized.**</u>

The second basis for Plaintiff's constructive fraudulent transfer allegation, under the Second

and Fifth Claims for Relief, is that Wall Street was undercapitalized – *i.e.*, that it was "was engaged

in business or a transaction, or was about to engage in business or a transaction, for which any

property remaining with the debtor was an unreasonably small capital."[21]

The same evidence establishing that Wall Street was comfortably solvent following the

Pledge establishes that it was sufficiently capitalized.  In determining the adequacy of capital for

purposes of 11 U.S.C. § 548(a)(1)(B)(ii)(II), courts "look to such factors as the company's debt to

---

[21] The second and fifth claims for relief are based upon Section 3439.04(a)(2) of the California Civil Code  and Section 548(a)(1)(B) of the Bankruptcy Code.  Section 3439.04 states in relevant part:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
>
> . . .
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:
>
>   (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

Section 548(a)(1)(B) of the Bankruptcy Code similarly provides, in relevant part:

> (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)  . . .
>
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or]

As with the balance sheet test, Plaintiff must show both that the Debtor received less than a reasonably equivalent value in exchange for the transfer, and that the Debtor was either inadequately capitalized or intended to incur debts beyond its ability to pay.  *See, e.g., In re Ponce Nicasio*, 2008 Bankr. LEXIS 338 at *34 - *38 (granting summary judgment on claim under California Civil Code § 3439.04(a)(2) even though defendants had not established that the transfer was made for reasonably equivalent value, because plaintiff had not come forward with substantial evidence establishing allegations under §3439.04(a)(2)(A) or (B)).

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    equity ratio, its historical capital cushion, and the need for working capital in the specific industry at

2    issue."[22]

3        As a holding company, Wall Street has limited capital requirements; its income is derived

4    entirely from rental and interest income, and historically it has had few recurrent liabilities. As such,

5    it is apparent that the amounts calculated under the various scenarios for the value of Wall Street's

6    equity were more than sufficient for Wall Street's needs.  [UMF 54].

7        **3.    Wall Street Was Able To Pay Its Debts As They Matured**

8        The third and final basis for Plaintiff's constructive fraudulent transfer allegations is that, at

9    the time of the Pledge, Wall Street was unable to pay its debts as they became due.[23]  There is no

10

11    [22] *Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 345 (Bankr.
      S.D.N.Y. 2007) (quoting *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*,
12    910 F. Supp. 913, 944 (S.D.N.Y. 1995).  While a company must be adequately capitalized, it does
      not need resources sufficient to withstand any and all setbacks.  *Id.*  "The critical inquiry when
13    considering whether a transfer or conveyance has left a company with an unreasonably small capital
      is . . . one that weighs raw financial data against both the nature of the enterprise itself and the extent
14    of the enterprise's need for capital during the period in question."  *Barrett v. Continental Ill. Nat'l
      Bank & Trust Co.*, 882 F.2d 1, 4 (1st Cir. 1989).  Similarly, the legislative committee comment for
15    California Civil Code section 3439.04(b)(1) states, "[t]he subparagraph focuses attention on whether
      the amount of all the assets retained by a debtor was inadequate, i.e., unreasonably small in light of
16    the needs of the business or transaction in which the debtor was engaged or about to engage."  *Nasr
      v. Geary*, Case No. CV 94-8288-JFW, 2003 U.S. Dist. LEXIS 13887 at *61 (C.D. Cal. June 9, 2003)
17    (quoting California Civil Code § 3439.04 legislative committee comment).

18    [23] These allegations are again based upon Section 3439.04(a)(2) of the California Civil Code and
      Section 548(a)(1)(B) of the Bankruptcy Code.  Section 3439.04 states in relevant part:
19

20            (a) A transfer made or obligation incurred by a debtor is fraudulent as
              to a creditor, whether the creditor's claim arose before or after the
21            transfer was made or the obligation was incurred, if the debtor made
              the transfer or incurred the obligation as follows:
22
              . . .
23
               (2) Without receiving a reasonably equivalent value in exchange for
24            the transfer or obligation, and the debtor either:

25            . . .

26             (B) Intended to incur, or believed or reasonably should have
              believed that he or she would incur, debts beyond his or her ability to
27            pay as they became due.

28    Section 548(a)(1)(B) of the Bankruptcy Code similarly provides, in relevant part:

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-19-

Case 2:10-ap-01950-BR    Doc 7    Filed 08/24/10    Entered 08/24/10 12:21:55    Desc
Main Document    Page 25 of 29

1  evidence that Wall Street intended to incur or incurred debts that were beyond its ability to pay as

2  they matured.  Once again, as a holding company, Wall Street had few recurring liabilities other

3  than taxes, and the fact that Wall Street filed bankruptcy only when Rassol threatened to foreclose

4  on its security interest in the pledged membership interests shows that it previously had no trouble

5  paying its debts as they came due.

**C.** **Because The Pledge Did Not Hinder, Delay, Or Defraud Actual Creditors Of Wall Street, Rassol Is Also Entitled To Summary Judgment On Plaintiff's Intentional Fraudulent Transfer Claims (First and Fourth Claims For Relief)**

Plaintiff's First and Fourth Claims for Relief allege that that the Pledge was made with actual

intent to hinder, delay, or defraud actual creditors of Wall Street.  These claims are based on

California Civil Code section 3439.04(a)(1) and section 548(a)(1)(A) of the Bankruptcy Code, both

of which provide that a transfer may be avoided as fraudulent if made with "actual intent to hinder,

delay, or defraud" any creditor of the debtor.

No creditor was hindered, delayed, or defrauded by the Pledge.  Wall Street's only

significant creditor on the date of the Pledge was Namco.  [UMF 4].  The Pledge was made as

security for the Rassol Loan, on which Namco was the primary obligor. [UMF 14].  Thus, far from

being made to hinder, delay, or defraud any creditor, the Pledge was made *for the benefit of Wall

Street's only creditor*.  Indeed, in *In re Lodi*, the bankruptcy court granted summary judgment in

favor of a defendant on a claim for actual fraudulent transfer where "the majority of the proceeds of

the [transaction] were paid to Debtor's creditors."[24]  In the instant case, the entire transaction was

made for the benefit of, and at the direction of, Wall Street's only creditor.

In *In re Ponce Nicasio*, the Bankruptcy Court for the Eastern District of California granted

summary judgment in favor of the defendants in an adversary proceeding that alleged actual intent

---

(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)  . . .(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

[24] *Nickless v. Lodi (In re Lodi)*, 375 B.R. 33, 40 (Bankr. D. Mass. 2007).

1   to defraud.[25]  The *Ponce Nicasio* court set forth eleven factors that should be analyzed in

2   determining whether actual intent existed, derived from California Civil Code section 3439.04.[26]

3   Those factors, as applied to this case, are as follows:

4   First, whether the transfer was to an insider.  Rassol disputes that it is an insider, but notes

5   that the *Ponce Nicasio* court found that the transfer in that case was made to an insider and

6   nevertheless did not find this factor determinative.

7   Second, whether the debtor retained possession or control of the property transferred after

8   the transfer.  This factor is obviously intended to apply to situations in which a debtor transfers title

9   to property to the transferee while retaining use of the property.  It has no logical application in a

10  case such as this where security interests in LLC membership interests are being pledged to secure

11  an indebtedness.

12  Third, whether the transfer was disclosed or revealed.  The Pledge was fully disclosed as

13  evidenced by a UCC Financing Statement that was filed with the California Secretary of State on

14  August 27, 2008.  [UMF 14].

15  Fourth, whether, before the transfer was made, the debtor had been sued or threatened with

16  suit.  There is no indication that Wall Street had been sued or threatened with suit. [UMF 55].

17  Fifth, whether the transfer was of substantially all of the debtor's assets.  As explained in

18  detail above, the Pledge did not result in a transfer of substantially all of Wall Street's assets.  After

19  the Pledge, Wall Street retained at least $12.81 million in equity.

20  Sixth, whether the debtor absconded.  There is no evidence that the Debtor absconded.

21  [UMF 56].

22  Seventh, whether the debtor removed or concealed assets.  There is no evidence that Wall

23  Street concealed assets in relation to the Pledge.  [UMF 57].

24  Eighth, whether the value of the consideration received by the debtor was reasonably

25  equivalent to the value of the asset transferred or the amount of the obligation incurred.  While

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

---

[25] 2008 Bankr. LEXIS 338 at *38 - *49.

[26] *Id.*

-21-

Rassol does not concede the issue of whether reasonably equivalent value was given for the Pledge, it notes that the *Ponce Nicasio* court found that the transfers in that case had not been made for reasonably equivalent value, and yet did not find this factor determinative.

Ninth, whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.  As shown above, Wall Street was not insolvent at the time of the Pledge and did not become insolvent as a result of the Pledge.

Tenth, whether the transfer occurred shortly before or shortly after a substantial debt was incurred.  There is no evidence that Wall Street incurred any substantial debts after the Pledge.

Eleventh, whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.  There is no evidence that Wall Street transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the Debtor.

At most, only two factors out of eleven (the First and Eighth) exist here. Importantly, the same two factors were found to exist in *Ponce Nicasio*, together with a third factor (pending litigation), and yet the *Ponce Nicasio* court nevertheless granted summary judgment with respect to the actual intent allegation.[27]  The court explained that eight of the eleven factors weighed against a finding of actual intent, and placed particular weight on the fact that the debtors had not transferred all of their assets and the fact that the debtors had not become insolvent as a result of the transfers.[28]  Those same two facts apply in the instant case as part of the nine factors out of eleven that weigh against a finding of factual intent.[29]

---

[27] *Id.*

[28] *Id.* at 48.

[29] The same analysis applies under the Bankruptcy Code, since the factors enumerated in *Ponce Nicasio* essentially subsume the "badges of fraud" that are traditionally considered by federal courts in determining whether actual intent exists under section 548(a)(1) of the Bankruptcy Code.  *See, e.g., Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 806 (9th Cir. Idaho 1994) ("Among the more common circumstantial indicia of fraudulent intent at the time of the transfer are: (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and, after the transfer, (5) retention by the debtor of the property involved in the putative transfer.").  Notably, at least four out of the five

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

D.    <u>The Allegation That Namvar Was Not Authorized To Sign The Pledge
Agreement Is False And Immaterial.</u>

Plaintiff alleges that Namvar was not properly authorized to sign the Pledge Agreement

because he was not an officer or director Sora, then the general partner of Wall Street.  This

allegation is simply false:  Namvar was in fact the Chief Executive Officer of Sora, Inc. as of the

Pledge Date [UMF 11].

In any event, the allegation is immaterial because Rassol was entitled to rely upon the

representations made by Namvar in executing the Pledge.  Article III, sec. 3.2 of the Pledge

Agreement explicitly states, "Pledgor has the legal right to pledge and grant a security interest in the

Collateral as herein provided without the consent of any other Person, other than such consent that

has been obtained."[30]  [UMF 14].  Moreover, Rassol was entitled to rely on Namvar's ostensible

authority in executing the Pledge Agreement.[31]  Given that Namvar was the Chief Executive Officer

of Sora, it was certainly reasonable for Rassol to rely on his representations in making the Pledge.

As a result, Plaintiff's unfounded allegation that Namvar was not authorized to execute the Pledge is

no impediment to granting summary judgment in favor of Rassol on all claims.

---

badges of fraud weigh against a finding of actual fraudulent intent.

[30] *See Meecorp Capital Mkts., LLC v. Oliver*, Case No. 09-2067, 2010 U.S. Dist. LEXIS 4595 at
*12-*13 (D. Minn. Jan. 21, 2010) (declining to recognize *ultra vires* defense and noting that
guaranty agreement warranted that obligations were valid).

[31] "[A]n agent acting within his ostensible or apparent authority binds the principal where the
principal has intentionally or negligently led others to believe that the agent possessed such
authority."  *Maxtor Corp. v. Read-Rite (Thailand) Co.*, Case No. C09202964 SC, 2003 U.S. Dist.
LEXIS 27208 at *19 (N.D. Cal. Dec. 4, 2003) (citing *C.A.R. Transp. Brokerage Co., Inc. v. Darden
Restaurants, Inc.*, 213 F.3d 474, 479 (9th Cir. 2000)).

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

**III.    CONCLUSION**

Based upon all of the foregoing, Rassol respectfully requests that this Court grant summary judgment in its favor on all causes of action asserted by Plaintiff in the Adversary Complaint.

DATED:  August 24, 2010

HENNIGAN, BENNETT & DORMAN
Bruce Bennett
Monika Wiener
Michael Schneidereit


By:    /s/Monika Wiener
            Monika Wiener

Attorneys for Defendant Rassol, LLC